UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------x
EUROPEAN SCHOOL OF ECONOMICS      :
FOUNDATION and ESE NYC, INC. d/b/a :
EUROPEAN SCHOOL OF ECONOMICS,     :    08 Civ. 2235 (TPG)
                                  :
                Plaintiffs,       :
                                  :    OPINION
      – against –                 :
                                  :
TEKNOLOJI HOLDINGS A.S. and       :
MEHMET EMIN HITAY,                :
                                  :
                Defendants.       :
------------------------------------------------x
```

Plaintiffs European School of Economics Foundation ("ESEF") and ESE NYC, Inc. d/b/a European School of Economics ("ESE NYC"), together "ESE," bring this action against defendants Teknoloji Holdings A.S. and Mehmet Emin Hitay for a declaratory judgment that the parties entered into a binding contract, and that pursuant to that contract, plaintiffs are entitled to retain a €500,000 payment which defendants made to plaintiffs. Defendants have filed a counterclaim seeking the return of the €500,000, based on the theory of unjust enrichment.

The action has been tried by the court without a jury. This opinion constitutes the court's findings of fact and conclusions of law.

The court finds that plaintiffs are entitled to a declaratory judgment that they may retain the €500,000. The counterclaim is dismissed.

**Facts**

Plaintiff ESEF is a New York State not-for-profit foundation. Plaintiff ESE NYC is a New York State educational corporation. Together they are engaged in developing innovative schools of economics abroad.

Defendant Teknoloji Holding is a foreign holding company existing under the laws of the Republic of Turkey, with a principal place of business in Istanbul, Turkey. Defendant Hitay is the principal of Teknoloji Holding and a citizen and resident of the Republic of Turkey.

On November 17, 2007, at a conference in Istanbul, Turkey, Hitay met an officer of plaintiffs named Stefano D'Anna. On November 20 Hitay and D'Anna met again at a dinner hosted by Hitay.

D'Anna was executive vice-president of ESEF. He was director of ESE. D'Anna was the author of a book entitled "School for Gods," which was apparently a best-seller in Turkey and which Hitay had read and admired.

On November 21, D'Anna and Hitay met at Hitay's office. The two discussed the possibility of opening a branch of the European School of Economics in Turkey. Hitay's assistant made minutes of what occurred at the meeting. Both sides in the present lawsuit agree that D'Anna and Hitay reached an oral agreement at this meeting for the establishment of the institution in Turkey. Part of this agreement was that Hitay's company, Teknoloji, would have the right to use the name of the European School of Economics and its logo. It was agreed that Teknoloji

would pay ESE a total of one million euros—50% "upfront," and the other 50% over five years.

ESE promptly sent Hitay a proposed written agreement dated November 21, signed by D'Anna, and another person connected with ESE, Allesandro Nomellini. This document was a faithful representation of the oral agreement. It specified, among other things, that Teknoloji would pay, upon receipt of the agreement, a fee in the amount of "euro 500,000" in consideration for the use of the ESEF and ESE names and logos in the Turkish territory. The agreement gave precise instructions as to how to make a wire transfer of the €500,000. The agreement went on to state that Teknoloji was to pay "an annual fee" in the amount of €100,000 again in consideration for the use of the ESEF and ESE names and logos in the Turkish territory.

There was a provision that the agreement would be for a five-year term and would remain in force except in the event of payment default. It was provided that the agreement should be governed by the laws of the State of New York, United States of America.

D'Anna also sent Hitay a "Business Plan." Hitay testified that he approved the Business Plan. The Business Plan included, among other things, a projected four-year profit and loss statement for 2008-2011. The statement showed revenues ranging from $2.5 million to $11.2 million over those years; expenses ranging from $1.6 million to $3.6

3

million; and gross profits ranging from $580,000 to $4.7 million. The projection assumed an exchange rate of €1 to $1.50.

At the trial, Hitay tried to indicate that he did not take these financial projections seriously. However, there is nothing to indicate that these were not good-faith estimates, based on ESE's experience. In any event, as already stated, Hitay testified that he approved the Business Plan.

Hitay testified at the trial that upon receiving the November 21 document, he had three objections, which he communicated to D'Anna. Hitay wished to have the arrangement last for an indefinite time. He wished to have the rights with regard to all publications which might emanate from the school in Turkey. Finally, he desired to have the agreement cover Northern Cyprus as well as Turkey proper. Hitay testified that he called D'Anna and raised these issues.

D'Anna did not testify at the trial. He resides in Italy. His deposition had been taken, largely through questioning by defense counsel. Excerpts from the deposition were read at the trial.

Both D'Anna and Hitay testified that there was a telephone conversation between them after Hitay received the November 21 document. There is some conflict as to what was said in the conversation. The court finds that the three points, described above, were raised by Hitay either in this conversation or soon thereafter for the purpose of having the proposed written agreement of November 21

4

redrafted, but the existence of the basic agreement was not denied. Hitay agreed to make the €500,000 payment, which he did by a wire transfer on November 26. The transfer was made exactly as directed in the November 21 document. Osman Gencer, the Chief Financial Officer of Teknoloji, sent an e-mail to ESE confirming the transfer.

It is appropriate to deal at this time with Hitay's testimony at the trial that the oral agreement reached on November 21 provided that the arrangement for the ESE school in Turkey, including the license for names and logos, would be for an indefinite time.

The deposition testimony of D'Anna does not deal with the question of whether anything was or was not said at the November 21 meeting regarding the duration of the project. However, the proposed written agreement of November 21 provided for a five-year term. The court finds that, although Hitay desired an indefinite period of time, it was not a term of the contract reached on November 21. The court believes that Hitay's desire in this regard was something which Hitay raised after he received the November 21 document, and the issue was surely the subject of discussion beginning at that time. The court believes that D'Anna dealt candidly and fairly with Hitay and it would have been quite out of character for D'Anna to make an oral agreement providing for an indefinite time and suddenly, that very day, without explanation switch to a five-year term in the proposed written contract.

5

Both sides obviously consented to having the November 21 document revised to flesh it out, and e-mails were sent back and forth about such possible revisions. These communications clearly recognized that a basic agreement had been reached. All of the points under discussion need not be set forth by the court. However, one is illustrative. Hitay indicated that a new company, other than Teknoloji, needed to be formed in Turkey to carry out the school project. Hitay initially proposed that he would own 80% of the shares of that company and ESE would own 20% of the shares. After negotiation, it was agreed that the shares would be owned 50-50.

The exchange of communications at this stage was entirely cooperative, both sides making concessions on the details under discussion. The attorney for Teknoloji testified that there was a meeting with ESE on November 28 at which a new draft written agreement was discussed. This draft is not in evidence. However, it may well be that such a draft is what is commented upon in D'Anna's email to Hitay of November 29, in which, among other things, D'Anna objected to an 80-20 stock split for the new company. In any event, the discussions between the parties appear to have been constructive, although all issues were not resolved.

For reasons which are not clear, the communications at this juncture did not deal with the issue of the term of time for the arrangement.

An e-mail from D'Anna to Hitay of December 4 (Def. Ex. J), an e-mail from Hitay to D'Anna of December 6 (contained in Def. Ex. K), and an e-mail from D'Anna to Hitay of December 8 (also contained in Def. Ex. K) indicate that a set of terms was agreed upon to be incorporated into a new version of the written agreement. D'Anna's e-mail of December 8 stated that ESE was preparing the final text and would send it to Hitay for signature. However, later on December 8, Hitay sent an e-mail to D'Anna stating that Hitay's people had already prepared the execution copy, which was attached to Hitay's e-mail. The fact that ESE and Hitay were simultaneously working on drafts of new versions of the agreement was something that created some discord between the parties, as will be described.

The proposed agreement submitted by Hitay was drafted by Hitay's attorney (Pl. Ex. 6). The document appears to have reflected what had been agreed upon except in two respects. The Hitay document provided that the duration of the arrangement would be "for an indefinite term" subject to certain defined rights of termination, but there was to be no payment beyond the €1 million paid during the first five years. Also, the document provided that the Turkish company would have publication rights as to all current and future publications of ESE and D'Anna, including the right of publication as to "School for Gods." It should be noted that the original oral agreement of November 21, according to the minutes made at the time, gave rights to Hitay only for the book "School

7

for Gods." Hitay had requested the broader agreement, but D'Anna had never consented to this. One point of agreement was that the territory included the Republic of Turkey and the Northern Cyprus Turkish Republic.

The draft was backdated, in that it stated that the agreement had been signed on November 23, 2007. The attorney drafting the agreement stated that she did the backdating so that the payment of €500,000 on November 26 could be deemed to be based upon the agreement.

Shortly thereafter, Hitay's attorney submitted a slightly revised proposed agreement which apparently Hitay understood was ready for execution. However, D'Anna told Hitay that ESE wished to have another review by its attorneys, and Hitay agreed that this could properly be done.

On December 24, D'Anna submitted the proposed agreements which had been drafted by ESE (Pl. Ex. 7 and 8). ESE had decided that there should be three agreements. The first would be a license agreement. The second would be a shareholders agreement. The third would deal with rights to the publication of the book "School for Gods." Only two had been drafted. These were the license agreement (Pl. Ex. 7) and the publication agreement (Pl. Ex. 8). The license agreement provided for the establishment of the school in Turkey which would be licensed to use the names and marks. However, it did not cover the details of stock ownership, etc. regarding the new Turkish company, but

8

provided that the parties would enter into the shareholders agreement to cover such matters.

In contrast to Hitay's proposed agreement, which provided for an indefinite term, and no payment beyond the one million euros during the first five years, the license agreement put forth by D'Anna provided for an Initial Term of five years, plus one Renewal Term of five years. There was to be one million euros paid during the first five years and then €200,000 per year during the five-year Renewal Term.

This led to an exchange of e-mails. Hitay wrote on December 25 strongly objecting to ESE's documents, which Hitay characterized as a proposed agreement which was "totally different (indeed a new one)." Hitay demanded that ESE sign Hitay's version or he would terminate the proposed business and ask for the return of the €500,000.

D'Anna responded on December 26. He stated that since ESE had an obligation to academic authorities in the U.K. and the U.S. and formalities to comply with, and since Hitay had "rightly asked for a formal licensing agreement," it had been necessary to create three distinct documents. However, D'Anna affirmed that the essential terms had been agreed upon. He made a list of these in his December 26 e-mail, which does appear to reflect what had been arrived at originally and the modifications agreed to during the recent negotiations. D'Anna obviously intended to convey the idea that some of the terms would appear in the shareholders agreement which had not yet been drafted

9

and which he referred to in the December 26 e-mail as the "joint venture" document.

It should be noted that D'Anna's December 26 e-mail stated that the Turkish company would have publication rights "of the existing and future ESE publications and SD's works for Turkey," "SD" obviously referring to D'Anna. However, the separate publication agreement (Pl. Ex. 8) only covered D'Anna's book "School for Gods." There is no explanation for this seeming inconsistency. However, there is no reason to doubt that D'Anna meant what he said in the e-mail and that the document would be revised to reflect what he committed to in the e-mail. This is consistent with D'Anna's conduct during the negotiations.

There was one point which had not been agreed upon. D'Anna stated that the arrangement could not be for an indefinite period of time because of what he claimed were United States laws about licensing agreements. He urged that a five-year renewal beyond the first five-year term was appropriate and was in use for all ESE campuses. D'Anna pointed out that the financial obligation of a total of one million euros during the Renewal Term would not be on Hitay but on the Turkish company, as part of its operating costs, and that therefore ESE and Hitay would in effect share this cost on a 50-50 basis.

Hitay responded with an e-mail on December 27, arguing about the accuracy of certain points that had been made by D'Anna. The court believes that, with one exception, these points could have been readily

resolved by some further work between the parties.  There was surely one point of disagreement arising from Hitay's request for an indefinite period of time for the arrangement with no payment after the first five years, versus D'Anna's proposal for five-year renewal with €200,000 per year during those five years.

The parties met in Turkey on January 10, 2008.  The testimony of Hitay and Hitay's lawyer makes it clear that the sticking point related to whether a €200,000 per year fee would be required for a Renewal Term.  During a break, Hitay told his lawyer that there was a deadlock and that he would not continue in the project.  When the meeting resumed, Hitay's lawyer, at Hitay's instruction, then told D'Anna that Hitay would not proceed further.

On January 11, an employee of Hitay e-mailed a request for the return of the €500,000.

On January 12, D'Anna called Hitay's lawyer and asked to have a discussion with her because D'Anna felt that the lawyer would understand things better than Hitay.  D'Anna said that he did not understand how "it got to this point."  Hitay's lawyer told D'Anna that Hitay had lost confidence in D'Anna and did not wish to go on.

The present action was filed on January 22.  Plaintiffs are not seeking a full-fledged recovery for breach of contract.  They are not claiming that they should be paid the full one million euros, admittedly agreed to as part of the basic contract.  They are suing to obtain a

11

declaratory judgment to the effect that they are not obliged to refund the €500,000 payment which was made. Defendant Teknoloji counter-claims, seeking to have the €500,000 payment returned on the theory of unjust enrichment.

## Discussion

Statute of Frauds

The statute of frauds voids an agreement that cannot by its terms be performed within one year from its making, unless it is in writing and subscribed by the party to be charged. N.Y. Gen. Oblig. Law § 5-701(a). The contract may be pieced together out of various writings as long as one is signed by the party to be charged and is referable to the same transaction as the other documents. Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 54-55 (1953); Lande v. Radiology Specialists of Kingston P.C., 806 F. Supp. 1084, 1091 (S.D.N.Y. 1992). The signed writing may be considered in light of the admitted facts and surrounding circumstances. Id. E-mail can constitute a signed writing that satisfies the statute of frauds. Stevens v. Publicis, S.A., 854 N.Y.S.2d 690, 692 (N.Y. App. Div. 2008).

The parties agree that New York's statute of frauds applies here and that the agreement in question could not have been performed within one year. The court finds and concludes that, in this case, there were sufficient writings subscribed by Teknoloji and Hitay or their authorized agent to comply with the statute of frauds. These writings

12

were (1) the November 21 written agreement; (2) the wire transfer of €500,000 on November 26, 2007 and the associated email from Teknoloji to ESE that day; and (3) various e-mails from Hitay to D'Anna clearly acknowledging the existence of the agreement which was made on November 21.

    Hitay and Teknoloji, through their trial attorney, conceded that an agreement was made on November 21. The written agreement of that date was signed by ESE but not by Hitay or Teknoloji. However, the wire transfer of €500,000 was made pursuant to the precise instructions contained in the November 21 document and was confirmed by an e-mail from an authorized officer of Teknoloji. In addition, Hitay's attorney in connection with the transaction testified in effect that there needed to be a contract to justify the €500,000 payment. The court deems the November 21 written agreement, the wire transfer of €500,000 and the confirmation of this transfer, to constitute a sufficient writing or writings to comply with the statute of frauds. When the further e-mails from Hitay are added to the picture, the case for such compliance is strengthened. The court refers to e-mails from Hitay to D'Anna dated November 29 (Def. Ex. H), December 6 (Def. Ex. K), and December 8 (Def. Ex. L), and the proposed written agreement sent from Hitay and Teknoloji (Pl. Ex. 6 and Def. Ex. F).

    It is true that certain details were the subject of discussion and negotiation, and ultimate disagreement. But this does not detract from

13

the fact that there was a basic agreement recognized several times in writing by Hitay, and that the €500,000 payment was made because of the existence of that basic agreement, and for no other reason.

Return of the Deposit

Clearly the €500,000 "upfront" payment was made because a contract was entered into.  The basic terms of the agreement were that Hitay would be permitted to establish an ESE school in Turkey and would be permitted to use the ESE names and logos.  One of the terms of that contract required the immediate payment of €500,000.  Hitay made the payment because the contract required him to do so.  There was no provision about the return of the €500,000.

The court believes that the document dated November 21, sent by ESE to Hitay, was a good reflection of the terms of the agreement. However, ESE consented to having the document revised to be in better form and to include certain details not contained in the November 21 document.  In this process, ESE proposed that there be a five-year Initial Term followed by a possible five-year Renewal Term.  The payment of a total of one million euros would apply to the Initial Term and an additional €200,000 per year, or a total of one million euros, would be paid during the Renewal Term.

In the view of the court, the proposal of ESE was a reasonable negotiating position.  A total of ten years can be regarded in this light. Moreover, in view of what the financial plan showed about estimated

profits, the €200,000 per year payment for the Renewal Term had a sensible basis, particularly when Hitay would in effect be paying only half of that.

Of course, Hitay was not required to agree to this proposal of ESE, and did not do so. Hitay wished to have the period of time indefinite, and no payment beyond the initial one million euros.

However, in the view of the court, Hitay could not refuse a reasonable request from ESE and simply break off negotiations, <u>and at the same time</u> expect to receive the return of the €500,000 which he had voluntarily paid because he had entered into the contract.

There is not an abundance of New York case law on point, particularly recent case law. However, the court believes that the law of New York is that when a party enters into a contract and makes a deposit or an "upfront" payment, and when the transaction is not completed without any fault on the part of the party receiving the payment, that party is not obligated to return the deposit or upfront payment. See <u>Keystone Hardware Corp. v. Tague</u>, 246 N.Y. 79, 83 (1927); <u>Karp v. R. Ritter & Co.</u>, 180 N.Y.S. 769, 770 (N.Y. App. Term 1920); <u>Nelson v. Landesman</u>, 193 N.Y.S. 574, 575-76 (N.Y. Mun. Ct. 1922); <u>Hauppauge Country Club v. Kabro of Hauppauge, Inc.</u>, 640 N.Y.S.2d 529 (N.Y. App. Div. 1996); <u>Sommer v. Hilton Hotels Corp.</u>, 376 F. Supp. 297, 301 (S.D.N.Y. 1974); <u>Knight v. Carter</u>, 146 N.Y.S.2d 129 (N.Y. Sup. Ct. 1955).

In the present case, the court can find no wrongdoing on the part of D'Anna or ESE.  D'Anna negotiated reasonably and made numerous concessions to Hitay.  There was a sticking point and Hitay withdrew.

It is important to recognize that ESE is not seeking a full breach of contract remedy for such withdrawal.  This is not a suit to hold defendants liable for the entire million euros required to be paid under the contract.  Plaintiffs are simply suing to keep the €500,000 paid to them.

The court finds and concludes that ESE, upon receipt of the €500,000, acted in an entirely responsible fashion to meet the requests of Hitay and Teknoloji to negotiate and arrive at a detailed written agreement.  In the view of the court, this means that ESE is entitled to retain the €500,000.

## Conclusion

Based on the foregoing, the court concludes that a contract was formed that satisfies the statute of frauds, and that plaintiffs are entitled to a declaratory judgment that they have a right to retain the €500,000 deposit.  Defendants' counterclaim for the return of the €500,000 is dismissed.

SO ORDERED.

Dated: New York, New York
May 4, 2011

Thomas P. Griesa
U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 05/04/11